People of the State of Illinois v. Gerald E. Sandage, Case No. 5-22-0495 Representing the appellant is Ms. Kerland. Are you here and ready to proceed? And representing the appellee is Mr. London. Mr. London, are you ready to proceed? Alright, thank you. Ms. Kerland, you get to go first. If you're ready to proceed, you may do so. I would ask you to, because we're recording this, please state your name for the record when you begin. My name is Kara Kerland. On behalf of the appellant, Mr. Gerald Sandage, may it please the court. When the police began their investigation into the alleged sexual assault of T.H., T.H. had only known my client, Gerald Sandage, for five days. The entirety of their interactions and the entirety of their communication existed within five days, September 19th to September 23rd, 2018. But when the police obtained a search warrant to seize Mr. Sandage's electronic devices that could contain evidence of this sexual assault, the warrant contained no limits on the search of these devices whatsoever. When allowing the police to search Mr. Sandage's phone, the warrant was not limited to information from these five days. In fact, it was not limited to information from the relevant week, the relevant month, or even the relevant year. And when the first officer searched Mr. Sandage's phone, he looked at years and years worth of content dating back to 2011. After the state's attorney declined to file charges based on this investigation, a new officer conducted a new search of Mr. Sandage's phone for completely unrelated reasons. During this expansive search, that officer found screenshots of leads in arms inquiries from February 2017 to January 2018. Counsel, wasn't this an ongoing investigation? Your Honor, at the point where the second search occurred, the state's attorney already decided that no charges were going to be filed. And as I will explain further, the investigation did evolve into a different topic. Now, it was these screenshots that were taken a full eight months prior to the five-day period under investigation, which resulted in Mr. Sandage's convictions for official misconduct. In this case, there is only one issue this court needs to resolve, and that is whether, under the Fourth Amendment, the leads in arms images found on Mr. Sandage's phone should have been suppressed. There are four reasons why the answer is yes. The first reason is that the warrant was not particularized. In People v. Weiss, this court held that a warrant would be found too general only in cases where a more specific alternative did a better job at protecting privacy while still permitting legitimate investigation. Here, the police already knew many very specific facts that, if included in the warrant, would have done a better job at protecting Mr. Sandage's privacy while still permitting legitimate investigation. The police knew, per the warrant affidavit, that the alleged sexual assault involved only Mr. Sandage and T.H. The police knew the exact dates of every encounter the two had together, and the police knew the exact locations of every encounter the two had together. The police also knew that the investigation, in Agent Border's own words, pertained to the time period from when Mr. Sandage and T.H. met to when his phone was seized. As I stated previously, this period was five days long, but the warrant contained absolutely no limits to the search of Mr. Sandage's phone whatsoever. If this court finds that the warrant lacked particularity, the evidence seized under it must be suppressed. But even if this court finds that the warrant was particularized, there are still three reasons why the evidence in this case should have been suppressed. One of those reasons is that the Plainview Doctrine does not apply. The Plainview Doctrine requires that the incriminating nature of evidence be immediately apparent. Here, the trial court found that the images were admissible because when Agent Border saw them, his experience as a law enforcement officer led him to conclude that there may have been a policy violation. Was this a personal phone or was this a department-issue phone that the defendant had? This was his personal cell phone that he was allowed to use for law enforcement purposes that was permitted. Well, since leads can only be used for official purposes, if I'm scrolling through somebody's phone and I see leads, screenshots, shouldn't that put up a red flag that this is a personal phone but he's got official stuff on there? Are you saying the fact that he could use it for official business takes it out of that? Yes. Officers in the department were able to use their personal phones for professional reasons. So just by seeing the leads images, the officers could not tell if it was used for personal or professional reasons because officers did conduct those searches on their personal phones. In addition to the leads info, wasn't there also a picture of a naked female? The officer, when he was conducting his search, he did find all sorts of images throughout the years, including images of naked women. But those images are not part of the evidence in this case and did not lead to his convictions for official misconduct. Here, as I stated, the trial court found that the images were in plain view. But such a finding does not comport with the facts of this case or of the law on plain view. As I just discussed, Agent Border did testify that he had no information to suggest that the photos on the phone were used for professional or personal reasons because officers could use their personal phone for professional reasons. He stated on the face of the screenshots, I could not tell how Mr. Sandage used them. Likewise, when Lieutenant McCullough conducted the second search on Mr. Sandage's phone, he said that he had no independent information to suggest that the screenshots were used improperly. Doesn't that at least raise a red flag, though, creating a reasonable articulable suspicion that more investigation needs to be done? If I've got lead stuff on my personal phone, doesn't that at least justify the police delving a little deeper? Well, Your Honor, if you can see by their testimony, they specifically said that they didn't know. And when they didn't know how the photos were used. So when you think about plain view and the incriminating nature being immediately apparent here, the testimony shows that it wasn't. And I think that a helpful indication of the fact that plain view doesn't apply would be contrasting the facts of this case with McCabot. So in McCabot, the officers were searching the phone. They were conducting an investigation into sexual abuse. And under the scope of that warrant, when they were searching, they came across two pictures of child porn, which, as they say, you know it when you see it here. The officers, when they saw these leads in arms images, they testified that they didn't know when they saw these images, if they were being used improperly. So when you think about how plain view to apply to McCabot, it is very different from the facts of this case. Did the officer also find, if I'm looking here correctly, there was some searches by the defendant regarding Xanax, Xanax, date rape, making chloroform, things such as that, that might, as Justice Vaughn said, raise a red flag, that further investigation should be necessary? I believe that those that data was found under McCullough's search, which was the second search, which I will discuss. So the plain view exception only applies if the search was within the scope of the warrant. But the second search of Sandage's phone was a new search for an entirely new and unrelated investigation into a new witness that was unknown at the time the warrant was executed. Simply put, McCullough's search of Sandage's phone exceeded the scope of the warrant. In People v. McCabot, the Illinois Supreme Court created a test to determine whether a search of an electronic device is within the scope of the warrant. This test turns on 10 considerations, 10 factors. I would be happy to discuss with this court all 10 factors if requested, but otherwise I'm going to focus my analysis on four specific factors. One factor is the technology available when the police search the phone. The police in this case used Celebrite technology. Celebrite is a database that takes all of the information from a phone and allows you to search it through many different parameters. So the police could search Celebrite chronologically. They could plug in search terms and look for specific words. They could plug in different cell phone numbers. So as an example, if the police wanted to contain their search to only September of 2018, they could have searched Celebrite and only seen information from September of 2018. If they wanted to search using TH's phone number, they could have put in her phone number into the database and only data and information relating to the phone number would have popped up. So the police here had the technology available to allow the officers to stay very specifically within the scope of the warrant, but the officers exceeded those parameters and wound up looking far beyond them. Another factor I wanted to discuss was subjective intent. So had Lieutenant McCullough's subjective intent been to investigate a criminal sexual assault of TH, that would be a factor weighing in his favor that his search was within the scope of the warrant. But that was not McCullough's subjective intent. McCullough stated multiple times that his investigation was a new investigation into policy violations and a new witness named Emma. This admittedly was not a criminal investigation, and it was not an investigation about TH at all. McCullough even told Mr. Sandage that when he was conducting this new investigation, he was going to look into information about Emma, the new witness, and he said to Mr. Sandage, I'm going to look at any piece of evidence that we may have for policy violations. So clearly, his subjective intent was not to stay within the scope of the warrant, which was a criminal sexual assault regarding TH. The last two factors I'm going to discuss together because they're intertwined, and that is the criminal activity being investigated and the evidence in the warrant affidavit. So as I've stated, the criminal activity being investigated was the sexual assault of TH. No one else was mentioned in the warrant or the warrant affidavit, and no other crimes were mentioned in the warrant or the warrant affidavit. The warrant affidavit contained specific information detailing the entirety of TH's interactions with Mr. Sandage in September of 2018. But McCullough ultimately found the leads in arms images that were taken at an entirely different time period and involved no information contained in the warrant affidavit. Now, McCavitt, of course, stems from People v. Hughes, which is the Michigan Supreme Court case. Hughes held that if a search is not reasonably directed at uncovering evidence of criminal activity alleged in the warrant, it is beyond the scope of the warrant. That was the exact situation in Hughes, and that is the exact situation here. Because McCullough's search exceeded the scope of the warrant, the leads in arms images found under it must be suppressed. Now, the last reason why the evidence here must be suppressed is because no exceptions to the warrant requirement apply. The state relies solely on a case called Monasco to argue that inevitable discovery applies to this case. Monasco is an unpublished civil federal district court case from the Eastern District of Missouri. Even aside from the fact that the case is not binding on this court or on any court in this state, the state's argument still fails. The state says that Monasco establishes a right for a supervisor to review the contents of an officer's personal phone for work-related misconduct purposes. But Monasco does not establish any such right. Monasco was a civil case involving document production. It had nothing to do with a criminal investigation. So because Monasco is factually and legally irrelevant to the case at hand, it does nothing to prove that inevitable discovery would apply here. The state also argues that good faith should apply because Lieutenant McCullough, after looking at hundreds of photos unrelated to TH, asked the state's attorney if he needed a warrant to continue his search, and she said, no, you do not. Simply put, the good faith exception only applies to a police's reliance on a judge's mistake. The logic, as explained in U.S. v. Lyon, is that a judge's neutral has no stake in the outcome of a case, and thus the exclusion of evidence has no deterrent effect on his or her behavior. Counsel, isn't the exclusionary rule designed to deter police misconduct? Yes, Your Honor. If the police ask the state's attorney, do I need a warrant, and they say no, where's the misconduct? The misconduct there has to do with the state's attorney, who is an arm of the law enforcement team. So here, as I said, the state is trying to expand this rule to the state's attorney, to apply to the state's attorney, the very person whose name is on the state's brief in this case. The state's attorney is not a neutral arbiter, but rather is a member of the law enforcement team, and she has a very clear stake in the outcome of this case. So Hughes, the Michigan case, dealt with the same exact fact pattern and issue on remand and determined that the good faith exception could not apply for this very reason. Because unlike a judge, a prosecutor is not a neutral and detached decision maker, but rather a prosecutor is part of the law enforcement team. Additionally, ruling here that good faith applies could create a dangerous incentive to prosecutors to provide wrong information to law enforcement in order to admit evidence that they otherwise would not be legally able to access. So with no applicable exceptions to the exclusionary rule, this court must find that the evidence in this case should have been suppressed and that Sandage's conviction be reversed that right. Thank you. Questions, Justice Booey? A couple things. Counsel, what's our standard of review in this particular case? Your Honor, issues of fact will be reviewed for clear error and only reversed if they are against the manifest weight of the evidence. Issues of law, such as the issues here, are reviewed de novo. Thank you. And also, I believe you filed a motion to cite additional authority, recent people versus Carson, which is another Michigan case that followed Hughes. Yes, Your Honor. I believe you granted that. Yes. Did you want to talk about that today, or do you need time, or were you requesting to do some supplemental briefing on that? I don't need time, nor do I need supplemental briefing. I'd be happy to answer questions. I filed the motion to cite additional authority regarding Carson just because this area of law hasn't fully been analyzed in Illinois, so I just thought it would be a helpful guidance to the court when considering a new law stemming from McAvitt. Well, it's obviously this digital evidence and things like that is always evolving. Yes. Continually evolving. Always. So, that's all I have. Thank you. Questions, Justice McKeon? I'll thank you, and you'll get time for rebuttal in just a moment. Thank you, Your Honor. London, are you ready to proceed? I am, Your Honor. You may do so, and again, if you would, state your name for the record for the recording purposes. Of course. May it please the court, counsel, students, and guests, my name is Richard London on behalf of the people of the state of Illinois. Your Honor, there is really no dispute here that defendant is guilty. Defendant's only question is whether or not the scope of the second review was within the original warrant and whether the original warrant was particular. This court reached a very similar decision on very similar facts in People v. Weiss. Two members of this panel were the concurring justices in that case. In that case, as Justice Bowie noted, the technology is ever-evolving. It's new. The Cellebrite technology that pulls off the digital data in that limited time period, roughly a year, had already changed, and this court found that the second review of the static data was relevant because Cellebrite had changed. They were able to now pull up information they hadn't been able to previously do, which was reviewing what appeared to be a simple calculator application, which, lo and behold, hid pictures, which was of naked minors. So, therefore, while looking for evidence of sexual misconduct, they found plain view evidence of pornography. Mr. London, the Weiss case seems distinguishable, though, in the sense that in Weiss, there was a warrant that gave certain parameters. Technology evolved. They had the copy of the phone in Weiss. Technology evolved where they could do a more detailed search, but it was the same parameters the original search warrant provided for. Here, the argument is the search warrant wasn't particular in what it allowed to be searched. It was too broad or overly broad, so that seems to be a little bit different than Weiss. Well, really, neither McAvett nor Weiss found that specifically. The fact is that what are the parameters? The parameters here were search of sexual misconduct. Sexual misconduct is not, as a defendant would argue, limited to a five-day period. Unlike other areas of law, Illinois has a specific statute. In general search warrant law, if I have evidence that somebody's dealing drugs out of their garage and I get a search warrant for the garage, and then when I get there, I don't find anything, well, he's a drug dealer. He might have had them in the house, too, so we go in the house. You're searching for drugs, but you don't get just to go willy-nilly wherever you want. Correct. You got a search warrant for a phone for sexual misconduct for something that happened in September of 2018. Do you then get to scan the whole search warrant? If he's had a search warrant for five years, does that – I mean, what happened to the Fourth Amendment? Well, the warrant didn't say just for conduct in those five-day period. The warrant said sexual misconduct. Specifically, and again, the difference is if you have a warrant for a garage, can you go in a house? No. A better analogy perhaps would be if you have a warrant for searching for guns in a house and you look for a gun underneath a couch, and while looking for the gun, you can't go into crevices that might be – it would have to be an area that finds a gun. While looking for a gun under a couch, you see white powder. Now, if you see white powder, is that inherently – are you convinced beyond a reasonable doubt that that white powder could be cocaine or other drugs? No, but it raises a red flag and gives you a reasonable articulable suspicion. In this case, while looking for evidence of sexual misconduct, under 725 LCS 515-7.3, you can look for propensity and for prior conduct which would be relevant in the prosecution of a sexual offense for TH. He's a police officer who's entitled to do lead searches and armed searches, and she says the witness testified they couldn't tell just by looking at that unlike cocaine or white powder where your red flag goes up. If I see a police officer has been searching leads, that's not a red flag necessarily, is it? I'm not as certain as counsel is that we have a definitive response to what was and wasn't allowable. Why? Because at least partially, because this was a stipulated bench trial, we didn't have an extensive cross-examination of McCullough. So we don't know exactly what the leads and arms evidence did. We do know that Officer Border said, wait a second, there was a lot of things that were concerning. What was of concern was looking at this at the downloads, we found evidence of pictures of naked women who appeared to be drugged and or drunk. So you say, wait a minute, there's more here. We need another search warrant. There's more here. We need to look further. Or do you say we need another search warrant, which is what they did, and they went to the state's attorney. Hey, this has gotten bigger. We need a search warrant. Not at this point. This is Border. This is the first search. So Border says, OK, I'm going to look a little further, and he finds downloads relating to within weeks. So it's not clear to me whether weeks were just before the conduct with TH or just after, but they find within weeks searches relating to Xanax, date rape, Xanax, date rape, and making chloroform. Again, given the fact that TH appeared to suggest that she was potentially date raped, there is a concern. So, again, this expands the parameters further. Border also says, I now find leads and arms searches. But can you, based on what you find, expand the parameters of the search warrant? Are you bound by the four corners of the warrant? You can. Again, can you expand if it is indeed in plain view? And we suggest that it is plain view. Plain view. The officer testified there's nothing readily apparent here on these leads information. The officer, again, Border testified there's nothing readily apparent. So how is that plain view? Nothing readily apparent, again, can be interpreted. And we don't know because there wasn't enough cross-examination. And to the extent if it isn't, that's a Fauci v. O'Brien issue, which the defendant bears the burden. What do I mean that there's not sufficient? Neither officer said that we weren't concerned or a red flag wasn't raised or this didn't give us reasonable articulable suspicion. What they said was, unlike potentially white powder, we don't know for a fact or pictures of pornography, child pornography. Yes, we know it when we see it. Here, do we know that the leads and arms were inherently criminal? Not beyond a reasonable doubt, but certainly there was a reasonable articulable suspicion. And indeed, these searches did lead to defendant being charged with four separate counts of sexual misconduct. So I do not know. And the record is not clear whether those leads and arms were of potential victims, were of the second victim, Emma. And again, we just simply don't know. But are you saying the search is OK then? Or are you saying applying the manifest weight of evidence standard, we defer to the trial court's finding that it was? I'm saying both. Well, let me just digress for a moment. I'm saying there was not a second search. The original search was valid. We do apply the manifest weight standard to the trial judge's findings of fact. But third and most importantly, perhaps, the second review by Officer McCullough was not a search. It was the same equivalent as a DNA where if you have found, for example, sheets, you know, that was one of the things that the Warren Court of Law called for. You can get sheets and linens that might show sexual, you know, Congress. You can submit it to a second review or second testing. That's all it was done here. As this court found in Weiss, it was the same static information. There was not a second download. They didn't ask for the phone back. Indeed, the phone was returned to the phone and iPad were returned to the defendant. The only thing that was reviewed was the static download itself. We have no information in this case, unlike Weiss, whether or not the Celebrite system had changed, whether or not there was new technology. Again, why? Because the witnesses weren't cross-examined on that. Defendant had the right and I would say the obligation to bring that out. What they're basically saying now is speculative. Well, we don't know exactly because if you take the exact wording that we were looking for policy violations, we don't know what a policy violation is. We don't know if the policy violation was simply that the Leeds and Arms could be a violation of departmental policy, using it for private purposes, or was that policy violation the sexual misconduct and the use of the Leeds and Arms databases to find additional victims, or was it used to find this particular victim? It is not clear. Good faith. We would disagree with defendant's explanation of what good faith is and how it should be applied and how Hughes applies to the concept of good faith. Good faith is indeed the exclusionary rule of the Constitution is a last resort. It is not something that is supposed to be a first resort. Why? Because it excludes relevant evidence. In this case, the police had good faith that, one, they were operating within the confines of the warrant. Two, the fact that they did approach the state's attorney and say, do we need a second warrant, is not legally binding to say that that's good faith, but it certainly is relevant. The police officer did everything that they could to say, okay, I think this might be a spot that, at least it's not a bad idea to inquire. As opposing counsel argued, that good faith argument has always been extended only to judicial mistakes. But I was a former state's attorney. They called me the chief law enforcement officer in the county. So, I mean, you are a law enforcement officer. So do we extend it now to the chief law enforcement officer of the county for good faith? Again, legally binding, no. But, again, a reasonable interpretation when you're looking as good faith is to prevent misconduct and overreaching. Are there special rules for the state's attorney? I'm thinking I don't remember seeing this argued. No. There are indeed not. But in the rules of professional conduct, the state's attorney has a duty not to just win, but to do justice. I thought you meant legally, yes. There certainly is. And, again, one would like to think and we would presume that any officer of the court would give advice that they believe is appropriate. It is also interesting here that defendant, not at the time, but defendant was a legal officer himself. And that the review, the policy review was specifically that before they took the chance of restoring the defendant and giving him powers, police powers, they needed to make sure that all the T's are crossed and the I's are dotted. So, again. That might be appropriate if you're talking about disciplinary action. But here you're talking about criminal charges. Which potentially is even more important. They didn't want to have somebody reinstated that had been accused of sexual misconduct and criminal charges. So, again, those policy review, we simply don't know because there wasn't an extensive cross-examination what that meant. If it was simply we are looking at only police policy misconduct having nothing to do with sexual offenses, that would potentially be beyond the warrant. That is not factually clear here. So, the good faith. Excuse me, Justice. Going back to if the state's attorney told the law enforcement you don't need a warrant. And going into that analogy of whether that was sound legal advice. If that was not sound legal advice, why should the defendant's rights be infringed because of that? If it is not sound legal advice, is that a binding determination that it is then bad faith versus good faith? No. Even if it isn't a sound legal, you know, the police are still under their reasonable belief that their conduct is valid. If it was, again, bad faith by the state's attorney's office, the state's attorney's office didn't believe. And I would bring Hughes in as an example. The difference in Hughes was not that it was the state's attorney's office that did or didn't give advice. The difference in Hughes was the state's attorney's office specifically said, we want you to look at a completely unrelated charge that the original search had not found. That's not what happened here. There's no evidence that the arms and leads were believed to be a separate offense, totally unrelated. Or it was not found by the original searches. Here it was found by the original search by the state police officer who there's some dispute. And again, the record isn't clear because, again, there was not extensive cross-examination. Whether Officer McCullough of the University of Illinois police, if he was told that their arms and leads pictures were there, what that entailed, whether it related or was interrelated to the sexual, the pictures of the naked women, if it was related to the date rape and other charges. And again, it's just not clear. The record isn't developed as fully as it could be. Any extent that the record isn't developed is a defendant's burden to demonstrate. I think the difficulty for this court is we've got two equally detestable positions here. You have a defendant that no one feels sympathy for. He's a police officer or semi-police officer who's using his position to molest women and date rape and harass them at home and that kind of thing versus giving the police unfettered access to your cell phone and your personal private life when all they needed was access to a little sliver. And the Supreme Court in one of the U.S. Supreme Court cases talks about how cell phones are different than anything else we've faced before because your whole life is on your cell phone. All your contacts, all your communications, all your bank records, everything you do in your life now is on your cell phone. So do we give the police, here's the guy's phone, do with it as you will, or do we put parameters on that? There should be, because we have an area of both technology for the cell phones and smart phones and iPads as well, as well as the Cellebrite or other similar systems, this is ongoing at all times. So where should we draw a line? This should be a perspective concern, not necessarily a retrospective. Is there any evidence in this case that the police officers did anything wrong and didn't exercise good faith? No. Is there a concern that with this growing technology, to be honest, I don't know how well your honors are familiar with Snapchat and technology. I certainly am not. I probably could ask most of the students in this room who could give a lot better explanation than I could. If I need any background, I ask some of my newer, younger colleagues, or to be honest, I ask my 20-year-old children to explain to me. And for this case and a case I had last week, which was a Snapchat, a photo taken from a Snapchat video, to explain exactly what selfies are, how they're contained, how Snapchat, which disappears from a phone, how it could be. And there is a law, and there have been discussions among prosecutors, and I'm sure the defense bar as well, moving forward more specific language and specific guidelines. This court can ask for further briefing, and we can provide that. This court can give guidance. This court could suggest that this is appropriate for the legislature to look at. I think our problem is where do we draw the line? In this particular case. But it seems like, as defense counsel is arguing, when they had the technology with the CelluBride or CellBride, whatever it's called, they could have limited the parameters, but they did not. They had it available, but they did not. Again, there wasn't testimony to that fact. There was because, again, there wasn't cross-examination. There was a report that suggested some of that. It's not completely clear. But, again, because of this specific area of law, you're not limited to that five- or seven-day period. You can look, because it's sexual misconduct, for both propensity and for prior conduct. That is not only relevant to bring other charges, but would be relevant with the offenses against this particular complaint in TH. So, as a result, they were allowed to expand the parameters. They were allowed to certainly expand the parameters to the few weeks' search of the Xanax and date rape. They certainly were allowed to see pictures of naked women in compromised positions. And at that point, yes, they had a reasonable articulal suspicion. They probably even had probable cause, but it certainly was – may I finish the thought? Yes, please. But certainly allowed the expansion beyond that five-day period, and that was reasonable. And those were all within plain view. When they were looking for those other images, they then found the leads in arms, which we would suggest is akin to the photos of child pornography, et cetera. Even if it wasn't 100 percent immediately clear that it was a violation, it certainly was a red flag or a concern that it was a violation. Thank you. Justice Booby, other questions? No questions. Thank you, Your Honor. One other question. The pictures of naked women, my understanding is they were unconscious or appeared to be asleep or out of it in the picture. I think one of the officers testified they were either unconscious or not right. Correct. So is it that fact that raised the red flag or just the fact that there were naked pictures on the phone? Given the facts of what was reported here in the warrant, it was the fact not just – if they were naked pictures or naked women and they possibly were from a Playboy magazine or something, that doesn't immediately raise a red flag. It's the fact that, and again, it is not clear because there wasn't extensive cross-examination, but it appears that they were more in a setting, perhaps the – and I'll admit this is speculative – the defendant's home or apartment. But, yes, it was the fact that they were not naked, but they were naked and appeared to have been drugged or drunk. But, again, this case before us today is not a sexual assault case. It's violating policy using leads improperly. Correct. But, again, was the search – I want to correct myself – was the second review looking for the offense relating to sexual assault and sexual misconduct that then found the leads in arms? And was the leads in arms within plain view? That's what this court needs – well, the lower court already made that determination. That's what this court needs to determine, and we'd say the lower court's finding was not beyond the manifest weight of the evidence. Any other questions based on my question? Thank you, counsel. All right, thank you. Thank you, Your Honors. Mr. Perlin, rebuttal. I have a few brief points, Your Honors. The first is that the state focuses a lot of their time discussing border search. I do just want to clarify that border search is not really material to this case. I discussed border search in detail in my briefing simply because the trial court analyzed the entire search only relating to border search. They did not really discuss McCulloch search, and they denied the motion to suppress because of border search. But if you look at all of these cases where there are two searches, the analysis has to do with the second search, and that's because the first search did not create that incriminating evidence that was used in the conviction. What is your response to the state's argument that this wasn't a second search, it was simply a review? Your Honor, that is definitively incorrect. McCabot made very, very clear that accessing information stored in an electronic device  as Justice Vaughn discussed, the immense amount of private information that's stored in a cell phone, any time you look at someone's cell phone, that is a search. And that gets to my next point. When you discuss McCulloch search and the analysis regarding Plainview, Plainview can only apply if the search is within the scope of the warrant. But here it is quite clear that the search was not within the scope of the warrant. When you look at McCulloch search, as I discussed, and you review all of the McCabot factors, Justice Vaughn talked about the Celebrate technology, the time period, the different parameters that he could have used, and they exceeded those. The subjective intent, all of these 10 McCabot factors, the state does not discuss any of those factors. McCabot was such an important case for the state because searches of electronic devices are new, they're complicated, we needed guidance. McCabot gave us that guidance, and using that guidance, analyzing those factors, it is quite clear that the search was not within the scope of the warrant. And the state has absolutely no response to that. I also do want to talk about bad faith because the exclusionary rule is a severe remedy. But the officers in this case were, at the very least, grossly negligent in their disregard for Mr. Sandage's Fourth Amendment rights. How do you say that when they did what an officer is supposed to do? They asked the state's attorney, don't we need a search warrant? I mean, they sought legal advice and then acted on that advice. How can you say they were grossly negligent? Yes, Your Honor. Well, first of all, the officers knew the limited scope of this search, and they started their search in that relevant time period in September of 2018. And once they didn't find incriminating evidence within that time period, they expanded their search through years and years of Mr. Sandage's phone. And importantly, McCullough testified he looked at hundreds and hundreds of photos before even asking the state's attorney if he needed a warrant. It wasn't a case where he saw photos that he thought were iffy and he immediately asked. He looked at hundreds of photos before he even asked. Now, I just want to conclude with a few points Justice Vaughn discussed. You were alluding to Riley v. California. So 10 years ago in Riley v. California, the United States Supreme Court emphasized not just the ubiquity of cell phones, but the vast amount of private and personal information they hold. Pictures of loved ones, sensitive messages, medical records, location data, financial documents. Today, any given person has their entire life accessible on their phone. The state is asking this court to rule that law enforcement can take a limited set of facts and use it as justification for searching into the entirety of someone's most personal and private information. To protect the liberty of all individuals and to safeguard the sensitive information stored in all of our phones, this court should find that Mr. Sandage's Fourth Amendment rights were violated, that the evidence in this case should have been suppressed, and that his conviction be reversed outright. Thank you. Thank you. All right, we appreciate your arguments. Two very good arguments. This is a difficult case, as I mentioned earlier, but we appreciate your arguments. We'll consider the briefs and the exhibits presented and your arguments today. We will take the matter under advisement and issue a decision in due course.